NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0266n.06

No. 22-3684

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

STATE OF OHIO *ex rel.* DAVE YOST,
Ohio Attorney General,

      Relator-Appellee,

v.

JOHN G. BREEN, et al.,

      Defendants,

JOHN E. BREEN,

      Defendant-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

FILED
Jun 09, 2023
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

OPINION

---

Before: SUTTON, Chief Judge; BATCHELDER and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** For over 30 years, the State of Ohio has attempted to find a remedy for pesticide contamination that the Breen family's pest extermination business caused to nearby residential property. Ohio ultimately sued the Breens under federal and state law seeking cost recovery and injunctive relief. The district court found that a permanent injunctive remedy was appropriate and ordered John E. Breen and his father John G. Breen to remove contaminated soil from the affected properties. John E. Breen appealed. For the reasons that follow, we **AFFIRM**.

## I.  BACKGROUND

### A.  Factual Background

In 1980, John G. Breen (Breen Sr.) and Janice Breen, his wife, bought a commercial property in Ohio (the Site) in their own names. At the time, Breen Sr. was the owner and president

of Buckeye Terminix Company, Inc. (Buckeye), which provided pest extermination services. He served as Buckeye's President/General Manager and as the President of its Board of Directors until 2002, and he managed its finances. Janice Breen was Safety Director and Secretary of the Board of Directors. Beginning around 1980, the two were the majority owners of Buckeye. In 1987, their son, John E. Breen (Breen Jr. or Appellant) also gained ownership in the company, then became its General Counsel and Vice President in 1992.

Buckeye provided extermination services in Ohio from 1957 until 2002 and was formally dissolved in 2007. The company was located at the Site from approximately 1980 until 2002. The Site housed Buckeye's building, which included an office space and a connected garage. Immediately to the Site's west was a steep embankment and a tract of five land plots (the Neighboring Properties), which were owned by Specialty Restaurants Corporation (Specialty) from 1985 until 2010, then by Trabue Dublin, LLC (Trabue), Specialty's subsidiary.

From 1980 until at least 1987, Buckeye kept pesticides at the Site for its extermination business. Employees used the garage and outdoor areas to mix, transfer, and store pesticides including chlordane, aldrin, heptachlor, and dieldrin. They also loaded, unloaded, and washed trucks containing pesticides at the Site, and they dumped water containing pesticides at the Site and onto its western embankment, which led to the Neighboring Properties. In 1981, Buckeye employees complained to the Ohio Environmental Protection Agency (OEPA) about the pesticide dumping. After collecting soil samples, the OEPA notified Buckeye that its disposal violated Ohio law and requested that Buckeye take measures to prevent further release of pesticides into the environment. Buckeye responded by installing a drainage collection system, paving its parking lot with asphalt, maintaining the vegetated area at the embankment, and allowing OEPA monitoring. The OEPA continued to sample soil, gravel, and water runoff at the Site in 1981,

1982, and 1989; each time, the agency found aldrin, chlordane, and dieldrin, as well as other pesticides.

In 1992, the OEPA Director issued a Director's Final Findings and Orders (the 1992 Orders), which applied to and bound Buckeye, its corporate officers and directors, and successors in interest. The 1992 Orders determined that Buckeye had used pesticides at the Site until at least 1987, including chlordane, aldrin, heptachlor, and dieldrin, and that the company had violated Ohio law by dumping industrial and hazardous waste in a manner that caused or threatened to cause water pollution at the Site and Neighboring Properties. The 1992 Orders required Buckeye, among other things, to implement an interim action plan to "characterize the extent of pesticide and volatile organic compounds" in the Neighboring Properties' soil and ground water, then to take "appropriate remedial measures . . . as approved by the OEPA." Buckeye was also required to repay the OEPA's oversight and response costs. The 1992 Orders would terminate only when Buckeye demonstrated in writing to the OEPA that all remediation tasks had been completed, paid OEPA's oversight costs, and demonstrated that any remaining contamination met OEPA's acceptable risk levels. The OEPA had to approve Buckeye's certification in writing as well.

By this time, Breen Jr. was managing Buckeye's environmental issues. He negotiated the 1992 Orders, hired environmental consultants, ordered soil samples and sent their results to the OEPA, and generally oversaw the remedial work outlined in the 1992 Orders. Then, in 1993, the OEPA approved an interim remedy for the Neighboring Properties, recommending revegetation of the contaminated area, or in the event of development, installation of a soil cover. In a 1996 letter to Breen Jr., the OEPA acknowledged that Buckeye had begun to implement appropriate remedies, and it affirmed that the 1992 Orders would terminate once acceptable risk levels had been achieved and certified in writing.

In 2002, the Breens sold Buckeye to its franchisor and changed the company's name to BTX Enterprises, and Breen Sr. and Breen Jr. divided the proceeds—about $3 to $4 million. Breen Jr. briefly continued to work with the OEPA to comply with the 1992 Orders, but he stopped responding to the agency after 2004. Over the following years, soil samplings continued to show concentrations of pesticide contamination well above the agency's acceptable risk levels. In 2008, the OEPA notified Breen Jr. of such; he did not respond. Then, in 2010, the agency sent him another letter providing notice of noncompliance with the 1992 Orders and directing him to submit a work plan for removal of contaminated soil at the Neighboring Properties by September 1, 2010. He did not respond to this letter either.

In 2011, the OEPA investigated the contamination at the Site and concluded that pesticide concentrations in the soil and ground water exceeded acceptable residential risk levels but not acceptable commercial risk levels. But in 2016 and 2017, soil samples from the Neighboring Properties indicated that pesticide concentrations there still exceeded acceptable residential risks.

### B.      Procedural Background

In 2016, Ohio sued the Breens, BTX Enterprises (Buckeye's new corporate name), Trabue (the Neighboring Properties' owner as of 2010), and Donald Dick (the Site's owner as of 2008), seeking cost recovery, damages from the Breens, civil penalties, and injunctive relief. As relevant to this appeal, Count Two of the Complaint accused the Breens and BTX Enterprises of violating the 1992 Orders and Ohio law. *See* Ohio Rev. Code §§ 3734.11(A), 3734.13(D), 6111.07(A). Ohio asked the court to order the Breens to complete the work required by the 1992 Orders.

On January 18, 2019, the district court granted partial summary judgment as to liability only on Count Two against Breen Sr. and Breen Jr., finding them individually liable for violating Ohio law. *Ohio ex rel. DeWine v. Breen*, 362 F. Supp. 3d 420, 446 (S.D. Ohio 2019). Then, in March of 2019, the court held a one-day bench trial to resolve the question of what relief was owed

to Ohio.  Ohio's position was that Breen Sr. and Breen Jr. should be ordered to remove the contaminated soil at the Neighboring Properties, and the Breens' position was that Ohio was not entitled to such a remedy.  Soon after trial and before issuing an opinion, the court stayed all proceedings to facilitate settlement discussions between Ohio and various defendants.

Ohio entered into consent decrees with Dick and Trabue that resolved all claims between Ohio and those defendants.  The property at issue in the Dick consent decree was the Site, not the Neighboring Properties.  After Dick purchased the Site in 2008, he took measures such as conducting indoor air and soil sampling, installing ventilation fans and a vapor barrier, and coating the garage floor with a protective sealant.  When the consent decree was entered, the soil contamination at the Site was within commercial standards and its contaminated areas were covered with a well-maintained asphalt pad.  In addition to maintaining the existing remedies, by entering the consent decree, Dick agreed to record an environmental covenant restricting the Site to commercial and industrial use.  In 2019, finding that the consent decree was reasonable and "provide[d] for protection of human health and the environment," the district court granted Ohio and Dick's joint motion to enter the consent decree and dismissed him from the case.

The Trabue consent decree, entered in 2021, concerned the Neighboring Properties.  Like Dick, Trabue was not involved in the Neighboring Properties' contamination—and there were no counts remaining against it.  The Trabue consent decree required Trabue to erect and maintain a six-foot iron fence around the Neighboring Properties' contaminated regions, and to conduct further soil sampling.  The consent decree provided that either the OEPA or Trabue "may determine that . . . additional work [] may be necessary" to achieve the consent decree's objectives.  Nothing in the consent decree was to "constitute or be construed as a release from any claim, cause of action, or demand in law" against any non-party to the consent decree, "including but not limited

to Defendant[] . . . John E. Breen" for any liability arising from conditions at the Neighboring Properties.

After entering the Trabue consent decree, the district court asked the parties to file a status report confirming whether any live controversies remained. Ohio and two defendants confirmed that the "only outstanding controversy" was between Ohio and the Breens.

In 2022, the district court issued an opinion finding that, as relevant here, Ohio was entitled to injunctive relief from Breen Sr. and Breen Jr. The court was persuaded that the relief Ohio sought, removal of contaminated soil from the Neighboring Properties, was warranted under the circumstances. Ohio was statutorily entitled to such a remedy under § 3734.10 of the Ohio Revised Code given the Breens' violation of Ohio law, and the district court concluded that the scope of the relief requested was reasonable. According to the testimony of the OEPA's lead technical risk assessor and site coordinator, the pesticide contaminants that had been dumped on the Neighboring Properties were potent carcinogens and did not degrade easily. All remediation strategies tried thus far had failed. Moreover, the 1992 Orders, which bound the Breens to remediate the Neighboring Properties, had not been terminated.

The Breens argued that an order requiring them to fence off the contaminated areas of the Neighboring Properties would be sufficient. The court agreed with Ohio that, compared to excavation of the contaminated soil, a fence would be an inadequate long-term remedy because it would "(1) require long-term maintenance and upkeep that excavation would not; (2) need to be constructed in a such a way as to prevent contaminated runoff material from escaping its bounds; and (3) be unlikely to stop a determined trespasser from scaling it." The court acknowledged that, after it had held a bench trial to determine the scope of relief warranted, Ohio entered into a consent

decree with Trabue to fence off the Neighboring Properties' contaminated areas, "effectively [binding] another, non-Breen defendant to implement the Breens' proposed remedy."

The court also concluded, however, that excavation was warranted. Thirty years after the Breens' company illegally dumped pesticides, the pesticide levels in the Neighboring Properties' soil remained dangerously high and unlikely to degrade to residentially acceptable levels any time soon. The court explained that Trabue's fence could "function as a stop-gap remedy for the State's exposure concerns," but there was "certainly no guarantee" that it would be a "permanent fix." And "[n]othing in the Trabue Consent Decree indicate[d] that the fence [was] intended to serve as the final remedy for the Neighboring Properties' pesticide contamination. Nor [had] the State given this Court any inkling that it no longer [sought] to have the Neighboring Properties' contaminated soil removed." The court ordered Breen Sr. and Breen Jr. to remediate the Neighboring Properties by removing, disposing of, and replacing with clean fill all contaminated soil that exceeded the OEPA's residential use standards.

Breen Jr. timely appealed, arguing that the injunctive relief ordered was inconsistent with the Dick and Trabue consent decrees (or an improper reversal or modification of those consent decrees), barred by the law of the case and judicial estoppel doctrines, and unconstitutional. An element of the summary judgment grant itself is also at issue because, in arguing that the injunction was the proper remedy, Ohio addressed that underlying order, and Breen Jr. permissibly responded on reply as to one of its aspects, his individual liability. *See United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989).

## II.   ANALYSIS

### A.   Standard of Review

A mixed standard of review applies when considering a district court's decision to grant a permanent injunction following a bench trial. We review the scope of injunctive relief for abuse

of discretion, factual findings for clear error, and legal conclusions de novo. *Wedgewood Ltd. P'ship I v. Township of Liberty*, 610 F.3d 340, 349 (6th Cir. 2010). Review of the underlying summary judgment order is de novo as well. *Walsh v. KDE Equine, LLC*, 56 F.4th 409, 416 (6th Cir. 2022).

An abuse of discretion occurs when the district court "relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Innovation Ventures, LLC v. N2G Distrib., Inc.*, 763 F.3d 524, 533 (6th Cir. 2014) (quoting *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 405 (6th Cir. 2006)). We must have "a definite and firm conviction that the trial court committed a clear error of judgment." *Id.*

As for the district court's trial findings, we review its factual findings for clear error but its application of the legal standard de novo. *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011). Factual findings from a bench trial are clearly erroneous, if, "based on the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 364-65 (6th Cir. 2009)).

## B. Summary Judgment

Breen Jr.'s only argument as to the district court's grant of summary judgment is that the court erred in finding him individually liable for violating the 1992 Orders. Looking to Ohio law, the district court found that Breen Jr. had served as an officer and director of Buckeye from at least 1992 to 2002, overseen sampling and remedial measures, organized the asset sale of Buckeye in 2002, and split the proceeds of that sale with his father. Since Buckeye had been officially dissolved in 2007, the company itself could no longer sue or be sued—but its corporate officers could be held personally liable under the state's personal participation theory. The court concluded that Breen Jr., who had served as a corporate officer of Buckeye, was indeed personally liable,

noting that he had actively participated in negotiating, executing, and following the 1992 Orders, had the authority and finances to comply with the 1992 Orders, and had instead chosen to ignore the OEPA.

Breen Jr. now argues that he never agreed to guarantee the 1992 Orders, never signed them, and never agreed to be liable—indeed, he disclaims any responsibility for Buckeye once he and his family sold the company and it was dissolved. This argument is at odds with the plain terms of the 1992 Orders, which are "binding upon [Buckeye], its officers and directors in their corporate capacity, agents, assigns, and successors in interest." Even if Breen Jr. did not sign the 1992 Orders, he personally negotiated them and served as an officer and director of Buckeye from at least 1992 until the Breens sold the company. In fact, he was the company's General Counsel and thus named in the 1992 Orders as the addressee for any OEPA correspondence about compliance.

As the district court explained, Ohio courts have applied the personal participation theory to find corporate officers liable. *Breen*, 362 F. Supp. 3d at 442-43. Under this theory, corporate officers can be held personally liable for tortious acts, including environmental law violations such as failure to comply with the 1992 Orders, *see* Ohio Rev. Code § 3734.13(c), if the evidence presented indicates that the officer participated or cooperated in that violation. *See, e.g.*, *State ex rel. DeWine v. Osborne Co.*, 104 N.E.3d 843, 857 (Ohio Ct. App. 2018); *State ex rel. DeWine v. Sugar*, 60 N.E.3d 735, 742 (Ohio Ct. App. 2016); *State ex rel. DeWine v. Deer Lake Mobile Park*, 29 N.E.3d 35, 45 (Ohio Ct. App. 2015). The evidence shows that Breen Jr. negotiated the terms of the 1992 Orders and was plainly on notice of their conditions. In accordance with those Orders, he then oversaw attempted remedial measures and corresponded with the OEPA about sampling and remediation until 2004, when he stopped responding to the OEPA's communications. Breen Jr. knew of the 1992 Orders' remediation requirements and had the ability to implement them, but

he "failed to take action even though he continued to receive notices of violations" of the Orders from the OEPA. *Sugar*, 60 N.E.3d at 743. Breen Jr. thus violated the 1992 Orders and Ohio law, and the district court correctly found him personally liable for those violations. Summary judgment was proper.

### C. Injunctive Relief

#### 1. The Relief's Propriety

##### a. Consistency with the Prior Consent Decrees

Breen Jr. argues that the scope of the permanent injunctive relief ordered against him is inconsistent with the Dick and Trabue consent decrees, effectively reversing or modifying them and forcing him, the last defendant standing, to "destroy" a remedy already in place.

We consider first the injunction's consistency with the two existing consent decrees. Breen Jr. claims it is "diametrically opposed" to them because excavating the contaminated soil from the Neighboring Properties requires him to remove the fence that Trabue installed around it, therefore negating the relief obtained through that consent decree. And, he notes, the Dick consent decree did not require any excavation of the Site.

The Dick consent decree addresses a different circumstance. Dick was not responsible for the contamination, and the property at issue in that consent decree was the Site—Buckeye's office location—*not* the Neighboring Properties. When the Dick consent decree was entered, soil contamination at the Site was within commercial standards. And, by entering the consent decree, Dick agreed to an environmental covenant restricting the Site to commercial and industrial use. The Neighboring Properties, on the other hand, are zoned for residential use, so a different remedy was needed to address the stricter residential risk levels caused by the pesticides that Buckeye dumped there.

Nor is the Trabue consent decree comparable. Like Dick, Trabue was not responsible for the contamination, and by the time the consent decree was entered, no counts against it remained. Ohio then settled with Trabue while pursuing further relief from the Breens (whose company had caused the contamination in the first place). As the court later noted, Trabue's fence was not considered a permanent solution; instead, it was a "stop-gap remedy for the State's exposure concerns." The consent decree itself never described the fence as a final remedy and expressly did not release Breen Jr. from liability arising from conditions at the Neighboring Properties. And finally, the court conducted a bench trial on the scope of relief, after which Ohio and Trabue entered into their consent decree; throughout those proceedings, Ohio never indicated an intention to abandon removal of the contaminated soil as a remedy. Ordering Breen Jr. to remove the contaminated soil was not inconsistent with the Trabue consent decree.[1]

In a similar vein, Breen Jr. claims that when the Dick and Trabue consent decrees were entered, the case should have been concluded because all outstanding issues had been addressed. He claims the district court effectively reversed or modified the consent decrees with its order, substituting its judgment for that of the OEPA.

First, the case was not resolved by the Dick and Trabue consent decrees, which remained in full force and effect. In fact, after entering the Trabue consent decree, the court specifically asked the parties for a status report confirming whether any live controversies remained. Ohio and two defendants confirmed that there was an outstanding controversy between Ohio and the Breens.

_____

[1] Breen Jr. cites *United States v. E. Ky. Power Co-op., Inc.*, 498 F. Supp. 2d 976 (E.D. Ky. 2007), and *United States v. Ala. Power Co.*, 372 F. Supp. 2d 1283 (N.D. Ala. 2005), *order vacated in part*, No. 2:01-CV-00152-VEH, 2008 WL 11383702 (N.D. Ala. Feb. 25, 2008), as evidence that the district court should not have given OEPA any deference in awarding injunctive relief because the agency's positions were allegedly inconsistent throughout the litigation. Neither case is binding, but more importantly, neither case is relevant. Each concerns the EPA's interpretation of statutes or rules and discusses consistency in the context of a *Chevron* analysis. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984).

Second, the district court did not substitute its judgment for the OEPA's in granting injunctive relief—it acted fully in accordance with our precedent. There is no dispute here that courts should not "engag[e] in a de novo review of the scientific evidence pro and con on each proposed remedy in the hazardous substance arena." *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991). Such decisions are properly left to the EPA, and courts are to "give a proper degree of deference" to agency expertise in "evaluating the efforts of an agency charged with making technical judgments and weighing complex data." *Id.* "Our role, as the CERCLA statute makes clear, is one of review on the administrative record, searching for errors of procedure and for glaring omissions or mistakes which indicate that EPA has acted arbitrarily and capriciously." *Id.* at 1424. The district court was faithful to these guardrails: it did not engage in its own independent scientific analysis or reach technical conclusions about what constituted an appropriate remedy under the circumstances. Instead, it appropriately relied on an OEPA risk assessment and testimony from the OEPA's lead technical risk assessor and site coordinator.

Last, the district court's order did not modify or reverse the Dick or Trabue consent decrees. The standard for justifying the formal modification of a consent decree is certainly "strict." *United States v. Michigan*, 940 F.2d 143, 150 (6th Cir. 1991). But not one of the parties that entered into either of the consent decrees at issue has sought modification or termination. To the extent the injunction requires Breen Jr. to excavate the contaminated soil currently fenced in by Trabue, the district court explained that a fence may be an appropriate short- or medium-term remedy, but a permanent remedial measure is appropriate given the Neighboring Properties' residential character and the inefficacy of interim remedies. The relief ordered by the court was consistent with the prior consent decrees.

b.  *Law of the Case and Judicial Estoppel*

Breen Jr. next argues that the law of the case and judicial estoppel doctrines barred the court from ordering injunctive relief.

Under the law of the case doctrine, "findings made at one point in the litigation become the law of the case for subsequent stages of that same litigation." *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994). The doctrine's goal is for litigants to be treated consistently, which is why "the same issue presented a second time in the same case in the same court should lead to the same result." *Howe v. City of Akron*, 801 F.3d 718, 739 (6th Cir. 2015) (emphasis omitted) (quoting *Sherley v. Sebelius*, 689 F.3d 776, 780 (D.C. Cir. 2012)).

Breen Jr. characterizes the law of the case as evolving from the Dick consent decree to the Trabue consent decree to the court's order approving the Dick consent decree. He claims that those filings "squarely address the issue of the appropriate injunctive remedy" and do not suggest that excavation is necessary; therefore, he is entitled to the same treatment and should not be required to excavate the contaminated soil. This argument is simply inapposite. "The law-of-the-case doctrine only applies to issues the court actually decided." *John B. v. Emkes*, 710 F.3d 394, 403 (6th Cir. 2013). The Dick consent decree did not address what remediation was necessary at the Neighboring Properties. The Trabue consent decree did not address what permanent remediation was necessary at the Site, or what remediation Breen Jr. should be liable for. And the 1992 Orders provided that remediation would be considered complete only upon the OEPA's approval, reserving the question of what a remedy might entail. The court's order granting injunctive relief resolved an issue addressed in none of the filings identified by Breen Jr. The law of the case doctrine does not apply.

Breen Jr. next claims that judicial estoppel applies to bar "a party from (1) asserting a position that is contrary to one that the party has asserted under oath in a prior proceeding, where

(2) the prior court adopted the contrary position 'either as a preliminary matter or as part of a final disposition.'" *Browning v. Levy*, 283 F.3d 761, 775 (6th Cir. 2002) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990)). When applying the doctrine, courts consider (1) whether a party's later position is "clearly inconsistent" with its earlier position; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled;" and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001) (internal quotation marks omitted).

Breen Jr. argues that Ohio's request for an injunction to have the contaminated soil excavated is inconsistent with its previous position in this litigation, given that Ohio entered into a consent decree with Dick that did not require excavation at the Site as a remedy. He claims that Ohio persuaded the court that its previous position was in the public interest, and that he will be highly prejudiced by the inconsistency because the court's order forces him, at "great expense," to "destroy" the fence mandated by the Trabue consent decree.

Consent decrees *can* serve as the basis for applying judicial estoppel, *see New Hampshire*, 532 U.S. at 751-53, but not here. Ohio's request for injunctive relief from Breen Jr. is simply not inconsistent with its previous positions, agreements with other parties, or agreements to pursue interim remedies. As explained above, the Dick and Trabue consent decrees served distinct purposes and are not comparable to the situation at hand. Under the terms of the 1992 Orders— the basis for this litigation—remediation is considered complete once contamination meets acceptable risk levels. Other remedies failed to achieve that goal, so Ohio continued its efforts to

achieve a complete solution. The Breens have been on notice of the need to permanently remedy the contamination their company caused since negotiating the 1992 Orders. No unfair detriment or advantage exists here. Like the law of the case doctrine, judicial estoppel does not bar the court's order.

### 2. The Relief's Constitutionality

Finally, Breen Jr. asserts that the court's order denied him equal protection in violation of the Fourteenth Amendment, on a "class of one" theory, and that the order is unconstitutional as applied because the governing Ohio law is silent on the scope of injunctive relief authorized. We need not address these arguments because, despite multiple opportunities to present them to the trial court, he raises them for the first time on appeal. *See McFarland v. Henderson*, 307 F.3d 402, 407 (6th Cir. 2002).

Breen Jr. argues that he had no occasion to raise the order's constitutionality below because Ohio's "improper conduct" (presumably its entry into the Dick and Trabue consent decrees) occurred only after the bench trial. But Breen Jr.'s challenge is to the remedy that Ohio requested at that trial—which, as discussed above, differed from the consent decree remedies for good reason. At the time of the trial, Breen Jr. was on notice of Ohio's desired remedy and could have argued its unconstitutionality to the court. He did not. And he does not argue on appeal that failure to consider the issue will result in a plain miscarriage of justice. *See Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 143 (6th Cir. 1997). We will not consider his claims of unconstitutionality.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.