RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0383p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
───────────────

JOY EBERLINE; TRACY POXSON; CINDY ZIMMERMANN,
     *Plaintiffs-Appellees*,

     *v.*

DOUGLAS J. HOLDINGS, INC.; DOUGLAS J. AIC, INC.;
DOUGLAS J. EXCHANGE, INC.; DOUGLAS J. INSTITUTE,
INC.; SCOTT A. WEAVER; TJ WEAVER,
     *Defendants-Appellants*.

No. 19-1781

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:14-cv-10887—Judith E. Levy, District Judge.

Argued:  May 5, 2020

Decided and Filed:  December 17, 2020

Before:  COLE, Chief Judge; BATCHELDER and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Matthew T. Nelson, WARNER NORCROSS + JUDD LLP, Grand Rapids, Michigan, for Appellants.  John C. Philo, SUGAR LAW CENTER FOR ECONOMICS & SOCIAL JUSTICE, Detroit, Michigan, for Appellees.  **ON BRIEF:**  Matthew T. Nelson, Amanda M. Fielder, WARNER NORCROSS + JUDD LLP, Grand Rapids, Michigan, Adam T. Ratliff, WARNER NORCROSS + JUDD LLP, Southfield, Michigan, for Appellants.  John C. Philo, Anthony D. Paris, SUGAR LAW CENTER FOR ECONOMICS & SOCIAL JUSTICE, Detroit, Michigan, Kathryn Bruner James, GOODMAN HURWITZ & JAMES, P.C., Detroit, Michigan, for Appellees.

     COLE, C.J., delivered the opinion of the court in which STRANCH, J., joined, and BATCHELDER, J., joined in part.  BATCHELDER, J. (pp. 18–31), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

COLE, Chief Judge.  Plaintiffs Joy Eberline, Tracy Poxson, and Cindy Zimmermann are former cosmetology school students who sued defendants Douglas J. Holdings, Inc., Douglas J AIC, Inc., Douglas J. Exchange, Inc., Douglas J. Institute, Inc., Scott Weaver, and T.J. Weaver (collectively, "Douglas J"), the operators of the Michigan cosmetology schools that the plaintiffs previously attended.  The plaintiffs claim that Douglas J owes them compensation under the Fair Labor Standards Act ("FLSA") for work performed during their time in school.  The district court granted summary judgment to the plaintiffs on a subset of their claims, holding as a matter of law that the plaintiffs were owed compensation under the FLSA for certain cleaning and janitorial work they were required to complete during their time as students at Douglas J.

We determine that the district court properly focused its partial summary judgment analysis on the specific work for which plaintiffs seek compensation, rather than on the entirety of the vocational training program in which plaintiffs participated.  It failed, however, to correctly apply our decision in *Solis v. Laurelbrook Sanitarium & School, Inc.*, which governs FLSA claims in an educational setting.  *See* 642 F.3d 518, 529 (6th Cir. 2011).  We therefore reverse the district court's order granting summary judgment to the plaintiffs and remand for proper application of *Laurelbrook* to the work at issue.

## I. BACKGROUND

### A.  Michigan's Regulation of Cosmetologists

We begin by recounting the complex regulatory structure that Michigan imposes upon cosmetologists and the schools that train them.  Michigan law requires people to obtain a license before they can perform cosmetology services for the public.  *See* Mich. Comp. Laws § 339.1203a(1).  Specifically, the law prohibits people from performing "any form of cosmetology services, with or without compensation, on any individual other than a member of his or her immediate family without a license."  *Id.*  Those services include hair care, skin care, manicuring, and electrology.  *Id.* § 1201(d), (f).  To be licensed, a person must meet several

requirements. He or she must be at least 17 years old and of good moral character, have at least a ninth-grade education, complete either a 1,500-hour course of study in a school of cosmetology or a two-year apprenticeship at a licensed cosmetology establishment, and pass a licensing examination. *Id.* § 1207.

Cosmetology schools themselves must also be licensed. *Id.* § 1203b. To maintain its license, a cosmetology school must meet several requirements, including that it must follow a state-mandated curriculum. *Id.* § 1205. The distribution of instruction time included in a school's 1,500-hour cosmetology curriculum is set by state regulation. *See* Mich. Admin. Code R. 338.2161. The curriculum must include 425 hours of classroom instruction on theory, 965 hours of practical experience, and 110 hours that are not assigned to any specific topic. *Id.* Both the theoretical and the practical hours are further controlled in that they must be divided between several different cosmetology topics such as facials, manicuring and pedicuring, hairdressing, and hair coloring, as prescribed by regulation. *Id.*

### B. Douglas J's Cosmetology Schools

Douglas J operates licensed cosmetology schools in Michigan. The plaintiffs in this case attended Douglas J's Ann Arbor, Grand Rapids, and East Lansing schools. At each school, Douglas J has classrooms that are used for theoretical instruction and operates a clinic salon where students work towards the 965-hour practical experience requirement set by the state. The clinic salons aim to "emulate a true salon setting," with "numerous styling stations . . . and a complete skin and nail spa." (Acad. Catalogue of Douglas J, R. 21-8, PageID 312.) The salons are open to the general public, and customers pay for beauty services provided by students under the tutelage of Douglas J's instructors. The salons also have a retail floor where apparel, tools, merchandise, skin and hair care products, makeup, and other products are available for sale. Douglas J's curriculum materials state that this retail floor "gives students the opportunity to enhance their product knowledge and retail sales abilities—skills essential to a successful career in the beauty and wellness industry." (*Id.*)

Only students perform cosmetology services for customers in the salons, doing so under the supervision of licensed instructors. The instructors assist and observe the students working

in the salon in order to evaluate their performance and ensure that the customers receive the service for which they paid. Ultimately, the students are graded for their work in the salon based on the technical execution of the service performed and the customer service experience provided.

Students sign an enrollment agreement with the school that does not include any mention of students being compensated for any of their time spent in salons, or for any other portion of their relationship with Douglas J. The plaintiffs in this case did not expect to be paid by Douglas J during their time at the school. The students also did not have an expectation of employment with Douglas J upon the completion of their educational training and knew that they would be responsible for finding employment as a cosmetologist after graduating.

Although students are not paid for their time in the salons, Douglas J does make a profit from the salons. These profits come from tuition paid by students, products purchased as required equipment by students, beauty products sold to customers in salons, and sales from salon services to the public. Douglas J employs the aforementioned licensed instructors and other guest-services personnel and also contracts with a janitorial service. Among the guest services personnel employed by Douglas J are aesthetics workers who are expected to sweep, dust, and polish the salons; clean and stock the shelves; clean windows; and generally keep the school clean.

## C. Cleaning and Janitorial Activities

Students are scheduled to work in the salons during set times, during which they may not always have a customer to work with. Douglas J provides its instructors with a list of acceptable activities to assign to students during such times. Some of these tasks appear to be related to the training of students for a career in cosmetology. Those activities include working on techniques using mannequins, assisting fellow students who are working with customers, and working on group projects with other students. Other tasks may be less related to the school's purpose. Students could also be asked to do laundry, restock shelves with products sold to customers, clean various stations where customer services are performed, and clean and replace coffee mugs, among other tasks.

Testimony from the students provides additional insight into the nature of these general cleaning and janitorial tasks. Eberline explained that students were required to wash, sort, and fold towels; sweep and dust the studio; clean glass surfaces; clean the break room microwave; and perform other jobs as needed. She added that students would not be permitted to leave until every station in the studio (not just the station used by the student) was so clean that "you could eat off of it pretty much." (Eberline Dep., R. 60-27, PageID 2325.) Poxson testified that students also were required to clean the break room, stock product shelves, and maintain shampoo and wax stations. She further described how students who were behind on their hours could also come in on days when the salon was closed to customers and help give the salon and classrooms a "deep cleaning." (Poxson Dep., R. 60-28, PageID 2404.) Zimmermann explained that students would empty the trash and clean the boards, tables, and floors in the school's classrooms as well. Instructors were encouraged to assign students these janitorial tasks and Douglas J's president testified that a student who refused to perform these tasks would be sent home for the day, denying that student of the opportunity to gain additional hours toward his or her state-imposed requirement on that day and necessitating that the student make up the hours on another day.

The amount of time spent on these activities varied by student. Eberline estimated that she spent a half-hour on these tasks each day, and nearly four hours on slower days. The plaintiffs extrapolate Eberline's estimates to conclude that she spent roughly 348 hours on these tasks over the course of her time at Douglas J. Using similar methods, they estimate that Poxson spent 304 hours doing these tasks and that Zimmermann spent at least 150 hours.

The plaintiffs argue that the cleaning and janitorial activities are not included in Douglas J's curriculum or in the state requirements for cosmetology schools.[1] Moreover, Douglas J does

---

[1]Douglas J and the dissent assert that these activities may have been included in the curriculum. Douglas J says that "Plaintiffs agree that, as part of their educational experience in the clinic, Douglas J trained them on proper sanitation procedures." Appellant Br. at 16. Michigan regulations do require instruction on sanitation and patron protection in cosmetology schools. *See* Mich. Admin. Code R. 338.2161. This instruction, however, appears to be distinct from the tasks for which the students are seeking compensation, as the regulations refer to instruction on ensuring proper sanitation of a cosmetology station before and after providing service to a customer and the tasks the students complain about are undertaken when there are no customers for the student to serve, or when not in the salons at all. Moreover, the time spent on the tasks at issue here seems to exceed the amount of time that the regulations allow schools to devote to sanitation. *See id.*

not provide classroom instruction on these tasks or supervise students as they perform them as it does for curriculum-related activities in the salons, because, unlike other tasks in the salon, student performance on these activities is not graded by Douglas J's instructors. To the extent that students did not complete the cleaning and janitorial tasks, they fell to paid workers.

Students, however, received academic credit for the time spent on these tasks in the sense that the time went toward their total hours of practical experience required for graduation. Eberline testified that the students' logs for their hours—which specify how many hours were spent on particular tasks—did not include a spot for hours spent on these cleaning and janitorial tasks, so students were instructed to "magically make those numbers work" by apportioning the hours spent on these tasks to the areas where the students were short. (Eberline Dep., R. 60-27, PageID 2340.) Whether Douglas J was permitted to issue credit for this time under state regulation is unclear, *see* Mich. Admin. Code R. 338.2161, but the parties do not dispute that all plaintiffs were credited for their time working on janitorial and cleaning tasks while at Douglas J and graduated on time.

## D. District Court Proceedings

The students filed a complaint under the FLSA in the United States District Court for the Eastern District of Michigan, seeking compensation for all time spent working in Douglas J's clinics. The complaint included allegations stating a collective action and that the three named plaintiffs represent a class of similarly situated individuals. The parties agreed, however, to stay conditional class certification proceedings while they litigated the question of liability through summary judgment. Class certification proceedings remain stayed pending this appeal. After discovery concluded, the students moved for partial summary judgment, arguing that there was no genuine dispute of material fact as to their claim that they are entitled to compensation for time spent working on general cleaning and janitorial tasks. The plaintiffs did not seek summary judgment on their other claims. Douglas J also moved for summary judgment as to all the plaintiffs' claims.

The district court granted the plaintiffs' motion for partial summary judgment on the grounds that the cleaning and janitorial activities were far removed from the educational

relationship between the parties and that Douglas J was taking advantage of the students by forcing them to perform the subject tasks. The district court found that the students were therefore employees under the FLSA. Accordingly, the court denied in part Douglas J's motion for summary judgment, but it granted summary judgment for Douglas J on the plaintiffs' remaining claims. The plaintiffs asked the district court to reconsider its decision to grant summary judgment to Douglas J on the plaintiffs' other claims for compensation. The district court denied the plaintiffs' motion for reconsideration without prejudice, stating that the plaintiffs could refile following our decision in this appeal.

The district court then granted Douglas J's motion to certify the summary-judgment order for appeal to this court under 28 U.S.C. § 1292(b). We granted Douglas J's request for an interlocutory appeal. Thus, we have appellate jurisdiction over Douglas J's appeal under 28 U.S.C. § 1292(b). All the issues raised in this appeal are legal ones, so our review of the district court's grant of summary judgment is de novo. *Chao v. Double JJ Resort Ranch*, 375 F.3d 393, 396 (6th Cir. 2004).

## II. ANALYSIS

The FLSA requires that employers pay employees a minimum wage. 29 U.S.C. § 206(a). The law—perhaps tautologically—defines "employee" to include "any individual employed by an employer." *Id.* § 203(e)(1). "Employ" is defined as "to suffer to permit work." *Id.* § 203(g). "Employers" include "any [individual, partnership, association, corporation, business trust, legal representative, or organized group of persons] acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203 (a), (d). The question in this case is whether students of Douglas J's cosmetology schools are employees at all.

In applying the FLSA's definition of employee status, courts have developed tests to analyze the question of whether an employment relationship exists. "Whether a particular situation is an employment relationship is a question of law." *Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994). In general, "it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment or something else." *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (quoting *Tony & Susan*

*Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 301 (1985)). This standard "is not a precise test susceptible to formulaic application." *Ellington v. City of East Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012). Rather, the employment relationship "is to be determined on a case-by-case basis upon the circumstances of the whole business activity." *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947)).

For vocational schools, we have rejected a proposed bright-line rule that no student can ever be considered an employee of his school. *Laurelbrook*, 642 F.3d at 523–24. In *Laurelbrook*, we explained that "determining employee status by reference to labels used by the parties is inappropriate." *Id.* at 524. Rather, "the proper approach for determining whether an employment relationship exists in the context of a training or learning situation is to ascertain which party derives the primary benefit from the relationship." *Id.* at 529. To determine the primary beneficiary, we look at factors like whether the purported employee had an expectation of compensation, derives educational value from the work, or displaces paid employees. *Id.* And we may consider "[a]dditional factors that bear on the inquiry . . . insofar as they shed light on which party primarily benefits from the relationship." *Id.* A plaintiff who claims entitlement to compensation under the FLSA for work done in a training or learning situation will only be considered an employee when she does not derive the primary benefit from the relationship. *Id.*

But before reaching the primary-beneficiary analysis in this case, we must answer two questions. First, do we apply the primary-beneficiary test at all when the work at issue is not part of the school's educational curriculum? Second, given that the students claim an entitlement to compensation for some, but not all, of the work they performed during the course of the vocational program, do we apply the primary-beneficiary test to only that targeted segment of the program at issue or to the educational program as a whole? As we explain below, the *Laurelbrook* test governs this case and applies only to the activities at issue in the claim for compensation.

## A. Applicability of the Primary-Beneficiary Test

We turn first to the question whether the primary-beneficiary test applies to the subset of the plaintiffs' claims presently before us. The district court determined that the test does not

apply.  It correctly observed that the primary-beneficiary test as announced in *Laurelbrook* is limited to situations where the activity in question occurs in a training or learning situation. After concluding that these activities fell outside of that situation, and thus the scope of *Laurelbrook*'s holding, the district court fashioned a new test to ascertain whether the tasks at issue constitute compensable work.

Under the district court's approach, a court would ask whether the activity in dispute was "'well beyond the bounds of what could fairly be expected to be part of the internship' or educational program." *Eberline v. Douglas J. Holdings, Inc.*, 339 F. Supp. 3d 634, 643 (E.D. Mich. 2018) (quoting *Schumann v. Collier Anesthesia*, 803 F.3d 1199, 1214–15 (11th Cir. 2015)).  If it is, the court would then consider "whether the employer is taking unfair advantage of the student's need to complete the internship or educational program." *Id.*  If the court found that the employer was in fact taking unfair advantage of the student's need to complete the educational program, it would determine that the relationship is one of employment for FLSA purposes so long as the time spent on the activities was not de minimis.  It was under this test that the district court found that the plaintiffs were employees under the FLSA and granted their motion for partial summary judgment.

The district court erred in using this new test.  Its error stems from its central premise for departing from *Laurelbrook*'s test: that the activities at issue are "not within the training or learning situation." *Id.* at 645.  To be sure, the janitorial tasks assigned to the plaintiffs were not a part of Douglas J's written curriculum, not required by the state regulations governing cosmetology education, and not directly supervised by instructors.  But other aspects of the relationship between Douglas J and its students lead us to conclude that the janitorial work took place within the educational *context*, regardless of its ultimate educational benefit.  The students were in the salons as part of the educational program, were assigned the tasks at issue by the same instructors who oversaw their practical training, received academic credit for the time spent on the tasks, and were told that they would be sent home—potentially delaying their graduation from the school—if they failed to complete the assigned tasks.  We therefore conclude that the tasks spring from the students' relationship with Douglas J, meaning that we must analyze this FLSA claim related to those tasks under the primary-beneficiary test as laid out in *Laurelbrook*.

**B. Application of the Primary-Beneficiary Test**

We now turn to the second question: How does the primary-beneficiary test apply in a case where students in a training or learning environment seek compensation for some, but not all, of the work they perform during the course of the educational relationship with the school? The parties present competing visions. The plaintiffs contend that we should apply the primary-beneficiary test only to the segment of time for which they seek compensation, asking which party is the primary beneficiary of plaintiffs' janitorial work. Douglas J asks us to apply the test to the entire relationship between the parties and would have us conclude that FLSA plaintiffs are not entitled to compensation for any of the work they perform within the vocational training program so long as the trainees are the primary beneficiaries of the program as a whole.

We conclude that when a plaintiff asserts an entitlement to compensation based only on a portion of the work performed in the course of an educational relationship, courts should apply the primary-beneficiary test we laid out in *Laurelbrook* only to that part of the relationship, not to the broader relationship as a whole.

**1. Propriety of a Targeted Approach for the Segment of Work at Issue**

We start with *Laurelbrook* itself. There, the putative employer was a Seventh-Day Adventist high school where students learn "in both academic and practical settings." *Laurelbrook*, 642 F.3d at 520. As part of the practical curriculum, and in line with the school's "stated mission," students were assigned to work in the school's kitchen and housekeeping departments, as well as in a sanitarium operated by the school. *Id.* The Secretary of Labor sued the school, contending that the students were employees under the FLSA based on the work they did as part of the school's practical learning program. *Id.* at 519.

After explaining the rationale for the primary-beneficiary test, we analyzed the work performed as part of the school's vocational training. *Id.* at 529–32. Instructive here, our analysis focused exclusively on the work that was the subject of the case. *Id.* To determine who was the primary beneficiary of this work, we considered the benefits of the students' kitchen, housekeeping, and sanitarium work to the school and the benefits that the students received from the work, ultimately concluding that the students were the primary beneficiaries because the

practical learning that the work afforded students was part of the school's educational program. *Id.* Notably, we did not consider the unchallenged parts of the program, such as the parts of the curriculum that included traditional classroom instruction, as no party contended that the high school students were employees during the time they spent in class and only the vocational program was at issue. *Id.* Thus, we effectively adopted the test that the plaintiffs ask us to use here; we considered whether the students were the primary beneficiaries of the activities for which their status as employees was in dispute.

Comparisons to other areas of employment also support the conclusion that relationships can be segmented for purposes of an FLSA analysis such that a person is an employee in one part of the relationship but not another. For example, the FLSA exempts from the definition of "employee" "any individual who volunteers to perform services for a public agency which is a State, a political subdivision of a State, or an interstate governmental agency" when the individual "receives no compensation" and the services she volunteers to perform are "not the same type of services which the individual is employed to perform for such public agency." 29 U.S.C. § 203(e)(4)(A).

The Department of Labor has issued regulations governing when a person who is employed by the state in one capacity can be considered a volunteer in another capacity. *See* 29 C.F.R. § 553.103. These regulations clarify that a person can simultaneously have an employment- and a non-employment relationship with the same entity. The Fourth Circuit applied § 203(e)(4)(A) and the accompanying regulations to a case involving city firefighters who also worked on volunteer rescue squads that performed emergency medical services for the city. *See Benshoff v. City of Virginia Beach*, 180 F.3d 136 (4th Cir. 1999). It determined that the firefighters were not employees entitled to compensation when it came to their work on the volunteer rescue squads, even though they were employed by the city as firefighters. *Id.* at 149. This is just one example of how courts have routinely segmented working relationships for the analysis of FLSA claims.

Other circuits that have considered FLSA claims brought by cosmetology students also use a targeted approach that focuses on the segments of work at issue. The Ninth Circuit, for example, considered a case where students sought compensation for all time spent in salons but

not their time receiving classroom instruction and applied the primary-beneficiary test to the time spent in the salons without considering the time spent in the classroom. *Benjamin v. B&H Educ., Inc.*, 877 F.3d 1139, 1142, 1147–48 (9th Cir. 2017). And the Seventh Circuit's analysis in *Hollins v. Regency Corp.* encompassed a similar scope, focusing on how the time in the salons related to the educational goals of the cosmetology program to reject a claim that the students were entitled to compensation. *See* 867 F.3d 830, 836–37 (7th Cir. 2017). In the end, these cases rejected the plaintiffs' claims not because they were the primary beneficiaries of their entire relationship with their schools, but because the plaintiffs received the primary benefit of the segments of the relationship that were in dispute.

The dissent takes a different view of other circuits' approach to this question, arguing that we have split with three other circuits that "have held that cosmetology students who work at for-profit cosmetology schools are not employees under the FLSA." Dissent at 27. As an initial matter, our opinion today only addresses how district courts should analyze claims for compensation related to a segment of work performed by a student at a vocational school, and we do not reach the question of whether the plaintiffs prevail under that standard. So the fact that other circuits resolved broader student claims in favor of cosmetology schools based on the facts of those cases does not create a circuit split. This is especially so given that our precedent directs us to resolve disputes in this context by turning to the "economic reality" of the relationship between the parties "on a case-by-case basis" and that employment status is "not fixed by labels that parties may attach to their relationship." *Laurelbrook*, 642 F.3d at 522 (quoting first *Alamo*, 471 U.S. at 301, then *Donovan*, 736 F.2d at 1116, then *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950) (Frankfurter, J., dissenting)).

Insofar as the dissent argues that we have deviated from other circuits or our own precedent by applying the primary-beneficiary test to the segment of work at issue, it is similarly mistaken. Despite saying that other courts have "eschewed a 'segmentation' approach," Dissent at 27 n.7, the dissent does not identify a single case where another court has addressed a claim for compensation limited to a portion of an educational program and considered elements of the parties' broader relationship in applying the primary-beneficiary test. *Cf. Velarde v. GW GJ, Inc.*, 914 F.3d 779, 785–89 (2d Cir. 2019) (analyzing a cosmetology student's work in the clinic

salon when he claimed an entitlement to compensation for all time in the salon); *Benjamin*, 877 F.3d at 1147–48 (same); *Hollins*, 867 F.3d at 837 (same, and noting that its holding was specific to the record of challenged activities before the court); *Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*, 98 F. Supp. 3d 750, 752, 755, 757–60 (E.D. Pa. 2015) (same); *Ortega v. Denver Inst. LLC*, No. 14-cv-01351-MEH, 2015 WL 4576976, at *13–17 (D. Colo. July 30, 2015); *Atkins v. Capri Training Ctr., Inc.*, No. 2:13-cv-06820 (SDW), 2014 WL 4930906, at *7–10 (D.N.J. Oct. 1, 2014); *Lane v. Carolina Beauty Sys., Inc.*, No. 6:90CV00108, 1992 WL 228868, at *3–4 (M.D.N.C. July 2, 1992) (considering a case where a former participant in a cosmetology school's teacher-training course sought compensation for all work done during enrollment in the course). Simply put, the dissent does not cite a case from this court or any other that used an approach inconsistent with the one we describe today. The primary-beneficiary test allows courts to separate claims brought by students who are merely doing the work their curriculum requires from those doing work that does not provide a similar curriculum-based benefit to the students. Through this test, we advance the FLSA's stated objective of ensuring that a minimum wage is paid to all employees "engaged in commerce." 29 U.S.C. § 206(a). Adopting Douglas J's proposed approach of applying the primary-beneficiary test to the whole educational program as opposed to the portion of the program actually at issue runs counter to the purpose of the primary-beneficiary test. It would raise the potential of zones of exploitation in which schools could use their students in place of paid employees to complete work unrelated to the educational purpose of the program, so long as the amount of extra work was not so large as to render the school the primary beneficiary of the overall relationship. Nothing in our case law, nor in the language of the statute, indicates that Congress intended or anticipated this outcome under the FLSA. *Cf. Alamo*, 471 U.S. at 301–02 (noting that permitting an enterprise to use a workforce of volunteers who otherwise meet the criteria for employee status might have a wage-depressing effect across the market, which would be contrary to the purpose of the FLSA).

Here, because of Michigan's occupational licensing requirements, schools like Douglas J are an access point through which a person who wants to make a living as a cosmetologist must pass. To the students, then, the benefit of attending cosmetology school is not merely academic, it is a statutory requirement they must fulfill before they can work in their chosen profession.

Douglas J's approach would let a school extract uncompensated labor from students that is non-educational so long as the value of that labor to the school does not exceed the value of the overall relationship to the students. But the benefit to the student is being able to work at all. In other words, this approach could lead to the type of exploitation that the FLSA was designed to combat.

Our targeted approach solves this problem in accordance with the purpose of the FLSA. It rejects claims for compensation where the school receives an incidental benefit from a student's work as part of the educational program. But it allows for the possibility of compensation for labor that—although related to the educational relationship in an attenuated way—does not actually provide a benefit to students that exceeds the benefit of free labor received by the school.

The dissent also states that our approach isolates the challenged activities from their educational context. Dissent at 24. Quite the opposite. Our holding that the primary-beneficiary test may be applied specifically to a segment of the vocational training program does not mean that the segment being analyzed can or should be taken out of its context. Where the segment of work at issue provides benefits as a result of its place in the educational relationship, our test would consider those benefits. Thus, for example, the district court should consider the fact that the students here received academic credit for the challenged work and should evaluate the relationship between these activities and the school's curriculum. The district court should not, however, consider benefits that come from a different part of the broader relationship that is not connected to the work at issue.

### 2. Practical Considerations

Douglas J raises a variety of practical concerns with our application of *Laurelbrook* to this case. These concerns include that the approach will result in conflicting determinations based on similar facts, will make FLSA claims in vocational-learning relationships more complex, and will require courts to separate a broader relationship into compensable and non-compensable tasks—all of which are related. None present serious challenges to the administrability of this rule.

The FLSA has long required fact-intensive analyses of employment circumstances. With any legal test, including the one that Douglas J proposes for this case, there is a possibility that different courts or judges might reach differing conclusions based on similar facts. Appellate review adequately addresses this concern.

Analyzing segments of the broader relationship also does not make the district court's job unduly complex. Courts are well-situated to conduct such a targeted analysis. We already do so, for example, when we consider claims brought by employees seeking compensation for their lunch breaks. In *Jones-Turner v. Yellow Enterprise Systems, LLC*, we held that emergency medical technicians were not entitled to compensation for their lunch breaks when they were expected to respond to emergency calls but were not required to stay in their trucks or perform other duties during the breaks. 597 F. App'x 293, 297–98 (6th Cir. 2015). We have also determined that mail carriers were not entitled to compensation for lunch breaks when they remained responsible for items and receipts that they were carrying during the break but were not otherwise required to perform duties related to their jobs during those periods. *Hill v. United States*, 751 F.2d 810, 814 (6th Cir. 1984). Similarly, we found that machine workers were not entitled to compensation when they were occasionally required to respond to supervisor inquiries or machine breakdowns during the breaks because those interruptions were rare. *Myracle v. General Elec. Co.*, 33 F.3d 55, 1994 WL 456769, at *5 (Table) (6th Cir. 1994) (per curiam). In these cases, we require an analysis of the specific facts of the plaintiff employees' lunch break to determine if the plaintiffs are acting as employees during that time, an FLSA analysis that courts have experience undertaking. Thus, we are not persuaded that they would have difficulty analyzing segments of the broader educational relationship between school and student.

As for Douglas J's final concern, it is correct that our approach may result in a court finding some tasks to be compensable but not others. But this is a feature of the approach, as it allows people who are acting as employees under the FLSA to be compensated accordingly. And to the extent that Douglas J fears an increase in claims related to segments of an educational relationship, we have established safeguards. We already reject claims for compensation when they are based on activities undertaken for de minimis amounts of time or are too difficult in practice to record. *Aiken v. City of Memphis*, 190 F.3d 753, 758 (6th Cir. 1999). Indeed, if the

time the plaintiffs spent on the extracurricular janitorial and cleaning tasks were de minimis, we might do so in this case. The record, however, reflects that some of the plaintiffs may have spent more than 20 percent of their time at Douglas J on those tasks. That amount of time is unlikely to be de minimis, and it is appropriate that our test requires a separate analysis of it.

### 3. Remand

Today, we only address the proper test to analyze claims like the one before us. As we have discussed, the district court did not apply this test when it granted the plaintiffs' motion for summary judgment. And absent exceptional circumstances, we do not resolve issues until the district court has ruled on them first. *E.g.*, *United States v. Poole*, 407 F.3d 767, 773 (6th Cir. 2005). Exceptional circumstances are not present here, so we decline to reach a conclusion as to which party is the primary beneficiary of the time the plaintiffs spent working on general cleaning and janitorial tasks. Accordingly, we do not hold that either party should prevail under the test we now direct the district court to apply, and our analysis should not be read to imply that one party is more likely to prevail on the merits.

Instead, we remand to the district court to apply the primary-beneficiary test to the plaintiffs' motion for partial summary judgment as described herein. This will allow the district court to consider the multitude of factors relevant to the primary-beneficiary inquiry in this case. Under *Laurelbrook* these include: the plaintiffs' lack of expectation of payment; the educational value, both tangible and intangible, of the tasks under scrutiny; and the displacement of paid employees to the school's competitive benefit in the commercial marketplace, *see* 642 F.3d at 522, 529, 531; as well as any other considerations that may "shed light on which party primarily benefits from the relationship," *id.* at 529. Such additional considerations might include: the mandatory or voluntary nature of the tasks; the relationship of the work at issue to the school curriculum, state regulations, and the school's stated mission and educational philosophy; the type of work performed in the corresponding real-world commercial setting; and the academic credit received by the plaintiffs for the work. Additionally, before concluding any portion of plaintiffs' work for Douglas J is compensable, the district court should determine whether the work at issue is for de minimis amounts of time or is practically speaking too difficult to record. *Aiken*, 190 F.3d at 758.

### III.  CONCLUSION

We therefore reverse the district court's order granting partial summary judgment to the plaintiffs and remand this case to the district court for further proceedings consistent with this opinion.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

BATCHELDER, Circuit Judge, concurring in part and dissenting in part. Three cosmetology-school graduates seek compensation for unpaid labor under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, claiming they worked as employees when they restocked beauty products and cleaned their schools' clinic salons. To determine whether an employment relationship exists in the educational context, we apply the primary-beneficiary test developed in *Solis v. Laurelbrook Sanitarium and School, Inc.*, 642 F.3d 518, 529 (6th Cir. 2011). Because the district court failed to properly apply that test, I concur in the judgment to reverse and remand. But the majority opinion likewise fails to properly apply our precedent and unjustifiably creates a circuit split with the Second, Seventh, and Ninth Circuits. I therefore respectfully dissent from the rest of the majority opinion.

## I.

Michigan heavily regulates its cosmetology industry to ensure the health and safety of patrons receiving cosmetic services. Michigan's Department of Licensing and Regulatory Affairs (LARA) establishes sanitation standards necessary "to prevent the spreading of an infectious or contagious disease" and conducts routine inspections to ensure compliance with those standards. Mich. Comp. Laws § 339.1203(1). LARA expects cosmetologists to follow general state and local health regulations, *see* Mich. Admin. Code R. 338.2171(2)(b), and for salons to be "clean, safe, and sanitary at all times," *id.* § 338.2173. Hair clippings must be disposed of after servicing every patron; fresh towels must be supplied for every service; and sinks, tubs, and shampoo bowls must be "thoroughly cleanse[d] and sanitize[d] . . . immediately after each use." *Id.*

Individuals cannot render cosmetology services without a license, which can be obtained only after completing 1,500 hours of study at a licensed cosmetology school. Mich. Comp. Laws §§ 339.1203a(1), .1207(d). Schools must provide at least 190 hours of combined classroom and practical instruction—90 classroom hours and 40 practical hours—on sanitation, patron

protection, personal hygiene, and salon management.  Mich. Admin. Code R. 338.2161.[1]  These health and safety topics are tested on the state-administered licensing examination; students must achieve a score of 75% to pass the test and obtain a license.  *Id.* §§ 338.2139, .2161.  Fifteen percent of the multiple-choice questions test knowledge of infection control and client protection, covering topics such as disinfectants, bacteria, virus, fungus, and decontamination. R. 60-40, PageID: 2664.  Ten percent of the questions ask about Michigan's cosmetology regulations, including licensing requirements and salon-management responsibilities.  *Id.* at 2665.  The multiple-choice exam also includes questions on relevant safety precautions for every cosmetic service.  *Id.* at 2664–65.  The "practical portion" of the exam scores students on whether they disinfected their workstations before and after servicing a client, *id.* at 2667, 2670, and practiced other safety criteria during every cosmetic service, *see, e.g.*, *id.* at 2668 (scoring students on whether they changed towels and cleaned spills).

The Douglas J Institute and its affiliate companies (together, Douglas J) operate several state-licensed, for-profit cosmetology schools in Michigan.  Douglas J implements the LARA's curriculum requirements regarding sanitation and patron protection through five units of instruction.  The first unit includes classroom instruction on safety requirements and guest-servicing skills, offering students opportunities to practice and test their knowledge.  R. 56-11, PageID: 1644.  According to Douglas J's written curriculum, students are taught how to: clean makeup brushes and wax pots, *see* R. 60-41, PageID: 2684, 2687; prevent infections, *id.* at 2688; and maintain a professional salon appearance, *id.* at 2677, 2695, 2700.  Students practice sanitizing and disinfecting their tools, *id.* at 2679, 2683, 2688, 2700, and are tested on infection control, *id.* at 2689, and maintaining a professional image, *id.* at 2677.

The next four units combine classroom instruction with practical instruction at Douglas J's student clinic salons.  R. 56-11, PageID: 1644.  In the classroom, students learn about Michigan's cosmetology regulations, R. 60-41, PageID: 2708, essential business standards, *id.* at 2709, 2710, and salon-life expectations, *id.* at 2712, 2713.  Under the supervision of licensed

---

[1]The LARA requires cosmetology schools to allocate a certain amount of time to each subject but allows up to 110 "unassigned hours"—i.e., hours not allocated to any specific topic.  Mich. Admin. Code R. 338.2161.  So, the regulation allows cosmetology schools to assign up to 150 hours of practical work related to sanitation-related topics.

instructors, students receive practical instruction by providing a range of cosmetic services to clients.

Due to need-work limitations, Douglas J students cannot spend all of their clinic time servicing clients; there are too many students and not enough clients. Douglas J provides its instructors with a list of activities for those students not working with clients, including practical work, styling practice, mannequin competitions, marketing, guest services, and general salon aesthetics. R. 60-37, PageID: 2652.**2** Students choose how to spend their time; Douglas J does not force students to participate in any particular activity. *See, e.g.*, Eberline Dep., R. 60-27, PageID: 2314 (explaining that students could choose to clean, concentrate on "bookwork" and "homework assignments" or "work[] on a mannequin"). Douglas J applies the hours spent on these activities toward the students' 1,500-hour requirements. A student who refuses to engage in *any* of the activities, however, cannot accrue hours because "sit[ting] around and play[ing] around on Facebook," does not count toward the state's curriculum requirements. Weaver Dep., R. 60-34, PageID: 2571–72.

Douglas J employs daytime support staff to maintain the cleanliness of its schools. The aesthetics personnel are responsible for cleaning the clinic salons; guest-services personnel assist clients and also clean the salons. *See, e.g.*, *id.* at 2564–66; R. 61, PageID: 2808. The daytime staff's cleaning efforts are supported by a nighttime janitorial service, which cleans the facilities six nights each week. Weaver Dep., R. 60-34, PageID: 2566.

## II.

Three former Douglas J students—Joy Eberline, Cindy Zimmerman, and Tracy Poxson—brought a putative class and collective action under the Fair Labor Standards Act (FLSA) for their unpaid labor at the clinic salons. They seek compensation for the hours spent restocking

---

**2**The record does not support the majority's assertions that the cleaning tasks—i.e., the general salon aesthetics activities—are unsupervised by Douglas J's instructors. *See e.g.*, Poxson Dep., R. 60-28, PageID: 2403 (affirming that the students' cleaning efforts were "supervised by instructors"); Eberline Dep. 60-27, PageID: 2326 (explaining that students would not receive credit for a service if they had not swept the floor). Indeed, the majority cites Eberline's testimony for the proposition that "students would not be permitted to leave until every station in the studio (not just the station used by the student) was so clean that 'you could eat off of it pretty much.'" Majority Op. at 5 (citing Eberline Dep., R. 60-27, PageID: 2325). If the Douglas J instructors were not assessing the quality of the students' cleaning efforts, who was?

products and cleaning the salons, as well as the hours spent providing personal services to paid customers.  Douglas J moved for summary judgment on all claims.  The students filed a motion for partial summary judgment, arguing that there was no genuine issue of material fact as to whether the students were employees when they conducted general labor and janitorial tasks that "consumed a significant portion of student time, displaced paid workers, and generated substantial profits for the schools' owners."  R. 60, PageID#: 2050.

The district court granted the students' motion.  *See Eberline v. Douglas J. Holdings, Inc.*, 339 F. Supp. 3d 634, 636 (E.D. Mich. 2018).  The district court recognized that in the educational context, the Sixth Circuit determines whether an employment relationship exists by applying the primary-beneficiary test developed in *Solis v. Laurelbrook Sanitarium and School, Inc.*, 642 F.3d 518 (6th Cir. 2011).  *Id.* at 641–43.  But the district court found that "an all-or-nothing determination of employee status is not appropriate in every learning or training situation." *Id.* at 643 (citing *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1214–15 (11th Cir. 2015)).  The district court therefore created a two-part test whereby courts determine if an activity is within the learning situation and if it is, *Laurelbrook*'s primary-beneficiary test applies.  *Id.* at 643.  But the district court said that if an activity is

> well beyond the bounds of what could fairly be expected to be a part of the internship or educational program, then the [c]ourt must look at whether the alleged employer is taking unfair advantage of the student's need to complete the internship or educational program.  If so, then the student would qualify as an employee for all hours expended in tasks so far beyond the pale of the contemplated internship that it clearly did not serve to further the goals of the internship.

*Id.* at 643–44 (internal citations, quotation marks, and editing marks omitted).  Finally, the district court explained that the complained-of activity must not be "de minimis" because the FLSA requires payment only where the "employee is required to give up a substantial measure of his time." *Id.* at 647 (quoting *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869, 873 (6th Cir. 2012)).

Applying this standard, the district court found that restocking products and cleaning the salons were not educational in nature.  *Id.* at 644–46.  Douglas J took unfair advantage of the students, the district court said, because it required their students to clean and therefore exploited

the "stark power imbalance" between the parties. *Id.* at 646–47. The district court concluded that the amount of time spent on these activities was not de minimis and granted the plaintiffs' motion for partial summary judgment. *Id.* at 647.

Douglas J moved for an interlocutory appeal, arguing that the district court's order was contrary to the overwhelming weight of authority. Pursuant to 28 U.S.C. § 1292(b), the district court certified its order for interlocutory appeal, defining the issue as "whether cleaning, laundering towels, and restocking products are activities that may be extracted from the entire relationship between the parties before examining their overall relationship under the primary benefit test enunciated in [*Laurelbrook*], because those activities are 'beyond the pale of the contemplated [cosmetology education and training].'" R. 105, PageID: 3913 (quoting *Schumann*, 803 F.3d at 1215)

## III.

We review the district court's grant of partial summary judgment de novo and will affirm only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). The plaintiffs have the burden of showing that no such dispute exists, even with the evidence presented in the light most favorable to Douglas J and with all reasonable inferences drawn in its favor. *See Hickle v. Am. Multi-Cinema, Inc.*, 927 F.3d 945, 951 (6th Cir. 2019).

## A.

The FLSA requires an employer to compensate its employees for services performed. 29 U.S.C. §§ 206, 207. Not all working relationships are subject to the FLSA; only "employees" are owed wages for unpaid labor. *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 299 (1985) ("An individual may work for a covered enterprise and nevertheless not be an 'employee.'"). To determine whether an employment relationship exists, courts assess the "economic reality" of the relationship. *Id.* at 301 (citation omitted). That determination depends on "the circumstances of the whole activity" and the parties' respective contributions "to the

accomplishment of a common objective." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727, 730 (1947) (citation omitted).

Schools conducting vocational-training programs or internships may fall under the FLSA's sweep if the school employs its students. *See Walling v. Portland Terminal Co.*, 330 U.S. 148, 151 (1947). Plaintiffs alleging FLSA violations in the educational context must prove that the school was the primary beneficiary of the working relationship. *Laurelbrook*, 642 F.3d at 529; *see Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 472 (6th Cir. 1999) ("A plaintiff generally has the burden of proving that his employer violated the FLSA."). The primary-beneficiary test assesses the "totality of the circumstances" within the school-student relationship. *Laurelbrook*, 642 F.3d at 524. That said, evidence that the school displaced paid employees with free student labor or failed to provide students with educational benefits will support a FLSA claim. *Id.* at 529.

*Solis v. Laurelbrook* is the leading case in this circuit dealing with employment relationships in the educational context. In *Laurelbrook*, the Secretary of Labor sued a boarding school for Seventh-Day Adventist high-school students, alleging violations of the FLSA's child-labor provisions. *Id.* at 519–20. Students spent four hours of each school day in the classroom and four hours in a vocational-training program. *Id.* at 520. The vocational-training program taught "practical skills" in classes such as Agriculture, Grounds Management, Mechanical Arts, and Plant Services. *Id.* at 520. The vocational-training program also required students to work in the school's sanitarium: a 50-bed intermediate-care nursing home. *Id.* Students were assigned to the sanitarium's kitchen and housekeeping departments; those sixteen years and older could participate in the sanitarium's state-certified nursing assistant program and provide medical assistance to patients. *Id.*

We found that both parties benefitted from the students' work in the vocational-training program. The school benefitted from the students' work in the "practical skills" classes by selling goods produced by the students, including flowers, produce, and wooden pallets. *Id.* at 530. Students also provided services to the paying public, caring for patients at the sanitarium and repairing cars for customers as part of a course on collision repair. *Id.* ("The proceeds from these sales go directly to [the school's] operations."). The students' work also helped the

sanitarium satisfy its state-licensing requirements. *Id.* Nonetheless, the benefits to the school were offset by the burdens of instructing the students, which meant that the school did not displace compensated workers. *Id.* at 530–31; *see also id.* at 520 (finding that the school would not operate the sanitarium if the students did not work there because the sanitarium's "sole purpose is to serve as a training vehicle for its students").

The students accrued several benefits from the vocational program, including hands-on training that allowed students to practice skills and compete in the job market after graduation. *Id.* Students also received a "well-rounded education" that valued "responsibility and the dignity of manual labor." *Id.* at 531 (finding that the program benefitted students by teaching them "a strong work ethic" and "leadership skills"). Ultimately, we held that no employment relationship existed because the students were the primary beneficiaries of the vocational-training program and were therefore not employees under the FLSA. *Id.* at 531.

**B.**

Both the district court and the majority here erred in their application of *Laurelbrook*'s primary-beneficiary test. In *Laurelbrook*, the Secretary of Labor sued the school for exploiting child labor. But we did not analyze each challenged activity—i.e., growing flowers and produce, building wooden pallets, repairing cars, caring for patients, maintaining the school's operations—in isolation from the vocational-training context. Rather, we evaluated how the working relationship benefited each party, accounting for the *entirety* of the school's vocational-training program. The instruction provided in the school's vocational classes—i.e., Agriculture, Grounds Management, Mechanical Arts, and Plant Services—were a crucial part of our analysis. *See id.* at 531 (finding that students benefitted from "courses of study that have been considered and approved of by the state accrediting agency").

The primary-beneficiary test thus requires us to assess how both parties benefitted from the students' work at Douglas J's clinic salons.[3] We must examine the students' time spent

---

[3]The majority emphasizes that the *Laurelbrook* Court "did not consider the unchallenged parts of the program, such as the parts of the curriculum that included traditional classroom instruction." Majority Op. at 12. It is true that *Laurelbrook* focuses on the students' vocational education, rather than the classroom education. But the *Laurelbrook* Court also found it significant that students received a "well-rounded education" that *included*

practicing cosmetic services—on customers and in classroom exercises—under the supervision of licensed instructors. And we must consider the fact that but for the hours spent at Douglas J's clinic salons, the students could not have qualified for the licensing exam or obtained a cosmetology license.

That Douglas J benefits from its students' work is not prima facie proof that the school is the primary beneficiary: *Laurelbrook* instructs us to consider how the benefits are offset by the burdens of running a cosmetology school. So, for example, we should consider the fact that Douglas J is in the education business, not the beauty-salon business. *See Hollins v. Regency Corp.*, 867 F.3d 830, 836 (7th Cir. 2017). Douglas J did not allow licensed cosmetologists to work at the clinic salons; only students provided cosmetic services. *See* Eberline Dep., R. 60-27, PageID: 2320–21. Moreover, we must determine whether the students' work displaced compensated employees at the clinic salons.[4] The economic reality of the parties' *relationship*— the very reason for their affiliation—cannot be appreciated without taking these facts into account.

Instead of applying *Laurelbrook*'s totality-of-the-circumstances test, the district court separated the challenged tasks—cleaning and restocking—from the rest of Douglas J's clinic-salon program. This analysis conflicts with *Laurelbrook*'s holistic requirements by considering tasks that a judge or a panel of judges deems educationally valueless in isolation from the vocational-training context. It thereby enables judges to make wholly subjective judgments about whether certain activities are "'well beyond the bounds of what could fairly be expected to

---

"hands-on, practical training . . . in an environment consistent with [the students'] beliefs." *Laurelbrook*, 642 F.3d at 531. The classroom-based instruction thus factored into the analysis. Nonetheless, even if we exclude any formal classroom instruction—i.e., any work not involving hands-on instruction—all of the students' work must be accounted for.

[4]The plaintiffs claim that they proved that the students' work displaced paid staff. *See* Appellee Br. at 9. But no one disputes that Douglas J employs support staff and a nighttime janitorial service to maintain the cleanliness of the schools. *See, e.g.*, *Eberline*, 339 F. Supp. 3d at 637. The district court should therefore determine the extent to which paid workers were displaced by the students work.

be a part of the internship' or educational program." *See Eberline*, 339 F. Supp. at 543 (quoting *Schumann*, 803 F.3d at 1214–15).[5]

There is no meaningful distinction between the district court's approach and the majority's "segmentation" approach—both analyze the challenged activities in isolation from the educational context.[6] But by evaluating only some activities conducted at the clinic salons, the majority fails to consider the entire working relationship between the parties and therefore contravenes our binding precedent in *Laurelbrook*. The majority says that in *Laurelbrook*, "we considered whether the students were primary beneficiaries of the *activities for which compensation was in dispute*." Majority Op. at 12 (emphasis added). That is not true. *Laurelbrook* does not isolate the challenged activities (i.e., the students' provision of goods and services to the paying public) from the rest of the vocational program (i.e., the vocational classes and practical instruction). *Laurelbrook* considers whether the students were primary beneficiaries of the school's *entire* vocational program—not whether the students were primary beneficiaries when they engaged in certain activities.

---

[5]In creating this new test for FLSA claims, the district court relied on dicta from *Schumann*, 803 F.3d at 1199, a case in which the Eleventh Circuit clarified the standard for determining whether an employment relationship exists in the internship context. In remanding the case, the *Schumann* Court cautioned that "the proper resolution of a case may not necessarily be an all-or-nothing determination" because it could "envision a scenario where a portion of the student's efforts constitute a *bona fide* internship that primarily benefits the student, but the employer also takes unfair advantage of the student's need to complete the internship." *Id.* at 1214. The *Schumann* Court imagined

> an employer who requires an intern to paint the employer's house in order for the student to complete a [medical] internship of which the student was otherwise the primary beneficiary. Under those circumstances, the student would not constitute an "employee" for work performed within the legitimate confines of the internship but could qualify as an "employee" for all hours expended in painting the house, a task so far beyond the pale of the contemplated internship that it clearly did not serve to further the goals of the internship.

*Id.* at 1215. The district court's application of the *Schumann* hypothetical is unpersuasive. In the *Schumann* hypothetical, the two relationships—one educational relationship and one employment relationship—are clearly demarcated by both time and place. Here, the challenged activities cannot be so easily extracted from the rest of the vocational-school setting because those activities were part and parcel of all the activities occurring under the broad sweep of Douglas J's curriculum. *Cf.* Majority Op. at 10–11 (concluding "that the janitorial work took place within the educational context").

[6]The majority refers to its approach as a "targeted" approach because it targets specific segments of the work at issue. Majority Op. 12–13. But even under a so-called targeted approach, the result is the same: it instructs courts to analyze only the work activities in its crosshairs without regard to the target's surroundings.

## C.

The majority opinion creates a circuit split; the Second, Seventh, and Ninth Circuits have held that cosmetology students who work at for-profit cosmetology schools are not employees under the FLSA.  *See Velarde v. GW GJ, Inc.*, 914 F.3d 779 (2d Cir. 2019); *Benjamin v. B&H Educ., Inc.*, 877 F.3d 1139 (9th Cir. 2017); *Hollins*, 867 F.3d at 830.  And contrary to the majority's assertion, *see* Majority Op. at 13–14, no other federal court has applied its novel "segmentation" approach to determine whether the FLSA applies in the cosmetology-school context.[7]

The Second and Ninth Circuits considered seven factors (the *Glatt* factors) to hold that cosmetology schools did not owe their students wages for hours worked at their clinic salons. *See Velarde*, 914 at 785 n.7 (citing *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536–37 (2d Cir. 2016)); *Benjamin*, 877 F.3d at 1146–47.[8]  The *Glatt* factors evaluate the *entirety* of the working relationship—not mere segments of it—between a cosmetology school and its students, assessing (1) the students' expectation of compensation, (2) the school's provision of clinical and hands-on training, (3) the students' receipt of academic credit, (4) the extent to which the work accommodates the students' academic commitments by corresponding to an academic calendar, (5) the duration of the program, (6) the displacement of paid workers, and (7) the students' expectation of employment with the school after the program.  *Velarde*, 914 F.3d at 785 n.7; *Benjamin*, 877 F.3d at 1146–47; *see also Hollins v. Regency Corp.*, 144 F. Supp. 3d 990, 998–1007 (N.D. Ill. 2015), *aff'd*, 867 F.3d 830 (7th Cir. 2017) (applying the *Glatt* factors to hold that cosmetology students were the primary beneficiaries).

---

[7]District courts in the Third, Fourth, and Tenth Circuits have also eschewed a "segmentation" approach, considering the totality of the circumstances at the schools' clinic salons.  *See Jochim v. Jean Madeline Educ. Ctr. of Cosmetology, Inc.*, 98 F. Supp.3d 750, 757–60 (E.D. Penn. 2015); *Ortega v. Denver Inst. LLC*, No. 14-cv-01351, 2015 WL 4576976, *13–17 (D. Colo. July 30, 2015); *Atkins v. Capri Training Ctr., Inc.*, No. 2:13-cv-06820, 2014 WL 4930906, at *8–10 (D.N.J. Oct. 1, 2014); *Lane v. Carolina Beauty Sys., Inc.*, No. 6:90CV00108, 1992 WL 228868, *3–4 (M.D.N.C. July 2, 1992).

[8]In *Hollins*, 867 F.3d at 837, the Seventh Circuit affirmed the district court's use of the *Glatt* factors but declined to "make[] a one-size-fits-all decision about programs that include practical training, or internships, or tasks that appear to go beyond the boundaries of a program."

In *Velarde* and *Benjamin*, the Second and Ninth Circuits applied the *Glatt* factors to find that cosmetology students were not employees under the FLSA. In both cases, the courts found that the students primarily benefitted from the vocational training because the students willfully enrolled in the programs knowing they would receive neither compensation for their services nor employment with the school. Moreover, the schools' curricula required students to work no more than the number of hours mandated by the state-licensing laws. Finally, the schools provided hands-on training related to classroom instruction, gave students opportunities to perform services under the supervision of instructors, and did not displace paid employees. *See Velarde*, 914 F.3d at 786–88; *Benjamin*, 877 F.3d 1139. The Second and Ninth Circuits thus evaluated cosmetology students' work in the context of the schools' entire clinic-salon programs, measuring whether students served *primarily* as employees of the schools' training programs or acted *primarily* as students. *Velarde*, 914 F.3d at 785.

Nor does the Department of Labor (DOL) interpret the FLSA to cover "segments" of work conducted by students in vocational-training programs or internships. Rather, the DOL instructs investigators to apply the seven *Glatt* factors to determine whether students working at for-profit businesses are employees under the FLSA. U.S. Dep't of Labor, Wage & Hour Div., Field Assistance Bull. No. 2018-2, *Determining Whether Interns at For-Profit Employers Are Employees Under the FLSA* (2018). The DOL recognizes that the "[student]-employer relationship should not be analyzed in the same manner as the standard employer-employee relationship because the [student] enters into the relationship with the expectation of receiving educational or vocational benefits that are not necessarily expected with all forms of employment." *Id.* (citing *Glatt*, 811 F.3d at 536).

The majority opinion ignores this distinction, thereby confusing the issue of whether a student is an employee with the issue of whether an employee is owed compensation. *See* Majority Op. at 13, 15–16 (citing cases concerning FLSA claims brought by *employees*). The latter question—the compensable-time question—is not focused on the nature of the relationship between the parties; the employer-employee relationship is a given. Rather, the question is narrowly focused on whether the employee is *working* during a particular time period. *See, e.g.*, *Hill v. United States*, 751 F.2d 810, 812 (6th Cir. 1984) (holding that an employee was not

working during a lunch period because the employee "had no substantial duties . . . that would inhibit his ability adequately and comfortably to pursue interests of a private nature"). The primary-beneficiary analysis makes a broader inquiry, focusing on the benefits accrued to each party by virtue of the educational and working relationship.

The majority eradicates any distinction between these distinct legal issues. The "segmentation" approach sidesteps the primary-beneficiary analysis by ignoring the context of the relationship. This approach is inconsistent with the purposes of FLSA, which "was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another." *See Portland Terminal Co.*, 330 U.S. at 151.

### D.

Finally, the majority's analysis is premised on the assumption that restocking shelves and cleaning salons are activities that confer little (if any) educational benefit to aspiring cosmetologists. *See* Majority Op. 6; *id.* at 5 (finding that the salon aesthetics activities are "less related to the school's purpose" of training students for a career in cosmetology); *id.* at 11 ("[T]he janitorial tasks assigned to the plaintiffs were not part of Douglas J's written curriculum, not required by the state regulations governing cosmetology education, and not supervised by instructors."); *id.* at 15–16 (explaining that the challenged activities fail to provide a "curriculum-based benefit" and are "unrelated to the educational purpose of the relationship"). Having made this subjective judgment, the majority holds that that the activities "[did] not actually provide a benefit to students that exceed[ed] the benefit of free labor received by the school." *Id.* at 15.[9]

---

[9]At the same time, the majority faulted the district court for failing to recognize that the challenged activities "spring from the students' [educational] relationship with Douglas J." Majority Op. at 11. In rejecting the district court's analysis, the majority concedes that "[t]he students were in the salons as part of the educational program, were assigned the tasks at issue by the same instructors who oversaw their practical training, received academic credit for the time spent on the tasks, and were told that they would be sent home—potentially delaying their graduation from the school—if they failed to complete the assigned tasks." *Id.* But if it is true that the challenged activities are "unrelated to the educational purpose of the program," *see id.* at 14, why would we apply the primary-beneficiary analysis to these activities?

But the plaintiffs failed to provide sufficient evidence to support the majority's assumption. Start with the curriculum requirements.[10] Douglas J's written curriculum includes classroom and practical instruction on cleanliness, infection control, and maintaining a professional salon image. *See* R. 60-41; R. 60-37 (giving instructors examples of salon-aesthetics activities, including cleaning, laundry, and restocking). One of Douglas J's owners testified that the school requires students to clean and do laundry because the LARA requires cosmetologists to keep their businesses "clean, safe, and sanitary at all times," Mich. Admin. Code R. 338.2171, .2173, and cosmetology schools to teach sanitation, patron protection, personal hygiene, and salon management, *id.* § 338.2161; *see* Weaver Dep., R. 60-34, PageID: 2571.

That the LARA prescribes cosmetology-specific measures to prevent infections and contagious disease in salons, requires schools to provide instruction on sanitation and salon management, and tests students on these topics, speaks to the educational value of the challenged activities. There is therefore a reasonable connection between Douglas J's cleaning and restocking requirements and the LARA's curriculum requirements regarding sanitation, patron protection, and salon management. The plaintiffs failed to rebut that connection with evidence that the challenged activities are somehow unrelated to the educational purpose of the relationship. *See, e.g.*, *Velarde*, 914 F.3d at 787 (finding that "clerical and janitorial work" allowed students to "gain[] familiarity with an industry by day to day professional experience") (citation omitted); *Hollins*, 867 F.3d at 836–37 (explaining that schools reasonably regarded activities like cleaning and restocking shelves as "part of the job of the cosmetologist," especially since "Salon Safety and Sanitation" is a "heavily tested subject area on the [state] licensing exam").

---

[10]Although the majority states that Douglas J asserts that the activities "may" be included in the curriculum, *see* Majority Op. at 6 n.1 (emphasis added), Douglas J explicitly asserts that the "general salon aesthetics" are a required component of its clinic-salon program, *see* Appellant Br. at 14.

**IV.**

For the foregoing reasons, I concur in the judgment to reverse and remand for the district court to correctly apply *Laurelbrook*'s primary-beneficiary test.  But I respectfully dissent from the majority opinion's rendition of that test because it directly conflicts with our precedent and creates an unjustifiable split from our sister circuits.